In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1438

CARLTON REIVES,

*Plaintiff-Appellant,*

*v.*

ILLINOIS STATE POLICE,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-3997 — **Charles P. Kocoras**, *Judge.*

ARGUED FEBRUARY 23, 2022 — DECIDED MARCH 31, 2022

Before SYKES, *Chief Judge*, and FLAUM and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Carlton Reives, who is Black, worked for the Illinois State Police ("ISP") until he retired in 2018. In 2016, he was suspended for sixty days for violating internal rules of conduct prohibiting false statements in connection with his employment. The same year, Reives's supervisors downgraded his ratings on his performance evaluation, leading him to receive a lower ranking on a list of officers

certified for promotion. Reives sued his employer, alleging that these two incidents constituted race discrimination in violation of Title VII of the Civil Rights Act of 1964. The district court granted summary judgment for ISP. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Plaintiff Carlton Reives, a Black male, is a former special agent at ISP. Reives worked for ISP from September 1989 to April 2018, when he retired. In this appeal, he alleges that ISP discriminated against him based on his race in two ways: (1) by giving him a sixty-day suspension and (2) by downgrading the ratings on his performance evaluation.[1]

*A. Sixty-Day Suspension*

Reives's suspension stemmed from a voluntary overtime detail assignment in 2016 in which he and his partner, Boram Kim, were to inspect businesses with video gaming machines to monitor for illegal gambling. Reives and Kim, who is not a member of Reives's protected class, were assigned ten locations in total, but they decided to each inspect five locations.

After Kim submitted an inspection report to his superiors, Lieutenant William Doster became skeptical of Kim's work activities and asked Sergeant Thomas Griffin to have Kim and Reives each submit a memorandum describing what time they arrived, who they spoke to, what they were looking for,

---

[1] Reives also alleged before the district court that he was discriminated against when he was placed on "proof status," which required him to provide medical certification from his personal physician whenever requesting sick leave, but he does not make this argument on appeal.

and what they did at each location. Sergeant Griffin instructed them to be as honest and accurate as possible.

Reives and Kim were supposed to complete the assignment over a five-hour shift, from 12:00 to 5:00 p.m. on January 24, 2016. Reives's memorandum stated that he arrived at the first location at 12:00 p.m., the second location at 1:00 p.m., the third location at 2:00 p.m., the fourth location at 3:00 p.m., and the fifth and final location at 4:00 p.m. But security footage showed Reives at his last location from 2:03 p.m. to 2:12 p.m. and passing through a tollbooth at 2:38 p.m. Kim's memorandum was more truthful. It stated that he arrived at his locations at 11:45 a.m., 1:00 p.m., 1:20 p.m., 1:40 p.m., and 2:30 p.m. Kim also disclosed that he attended a wake at 3:45 p.m. while he was still on duty.

Following an internal investigation, Reives and Kim were charged with violations of the Rules of Conduct ("ROC"). Reives received three charges. He was charged with two violations of ROC Paragraph III.A.33, which requires officers to submit truthful and complete reports and prohibits them from knowingly making false statements in department records, for documenting false arrival times at the businesses he inspected (1) in his inspection reports and (2) in his memorandum. Reives was also charged with violating Paragraph III.A.40, which mandates that officers truthfully answer any questions directed to them about the scope of employment and department operations, for submitting the untruthful memorandum in response to Sergeant Griffin's orders. A violation of Paragraph 33 is considered Level 5 Misconduct and carries a recommended penalty of a sixty- to ninety-day suspension, while the recommended penalty for a violation of

Paragraph 44, deemed Level 4 Misconduct, is a suspension of thirty-one to forty-five days.

Kim, on the other hand, was charged with one violation of ROC Paragraph III.A.12, which requires officers to perform their duties "in a manner that will maintain the highest standards of efficiency in carrying out the functions and objectives of the Department," for attending a wake while on duty without authorization. A violation of Paragraph 12 is considered Level 1 Misconduct, and the recommended penalty for this offense ranges from a reprimand to a three-day suspension.

A suspension of thirty days or more must be imposed by the ISP Merit Board. A complaint against Reives was issued to the Merit Board for (1) submitting false inspection reports, (2) submitting a false departmental memorandum, and (3) failing to truthfully answer the questions of a superior officer. After a hearing, the Merit Board issued a decision on October 24, 2017, finding that Reives violated Paragraphs 33 and 40 and imposing a sixty-day suspension. Kim's disciplinary charge, which did not carry a recommended penalty of a suspension of thirty days or more, was not referred to the Merit Board, and he was issued a three-day suspension.

### B.  Performance Evaluation

At ISP, the Merit Board certifies those who are eligible for promotion and ranks them based on performance evaluations, written tests, and seniority. ISP can then fill vacancies from the list of certified individuals. The top ten officers on the list are all equally certified for promotion, with no ranking. Officers outside the top ten are given a numerical rank.

A performance evaluation rates an officer as "Needs Improvement," "Meets Expectations," "Exceeds Expectations,"

or "Not Applicable" across thirteen categories. In Reives's October 2016 evaluation, Sergeant Griffin initially rated Reives as "Meets Expectations" in six categories, "Exceeds Expectations" in six categories, and "Not Applicable" in one category. Sergeant Griffin then discussed Reives's ratings with Lieutenant Doster. As a result of the discussion, Sergeant Griffin downgraded the ratings in four categories from "Meets Expectations" to "Not Applicable" and in two categories from "Exceeds Expectations" to "Meets Expectations." Reives was then presented with his revised evaluation.

Based in part on this performance evaluation, Reives was ranked twenty-sixth in the 2016 promotion rankings and was certified for promotion to sergeant. The year before, in 2015, Reives had been ranked twelfth and had also been certified for promotion. In 2017, by contrast, Reives was ranked twenty-seventh and was not certified for promotion. Reives had been paid the salary of a sergeant since 1998, when he became a special agent, even though he did not hold the "hard rank" of sergeant.

*C.  Procedural History*

Based on these facts, Reives sued ISP for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ISP filed a motion for summary judgment, which the district court granted. Reives now appeals.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, construing facts in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011). "Summary judgment is appropriate where the

admissible evidence shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing Fed. R. Civ. P. 56(a), (c)).

As stated, Reives claims race discrimination based on his sixty-day suspension and his downgraded ratings. We discuss each issue in turn.

*A.  Sixty-Day Suspension*

Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff in a Title VII race discrimination suit must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Once a *prima facie* case has been established, "the burden shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)).

Reives, however, urges us against "a rigid adherence to the *McDonnell Douglas* burden shifting analysis" because that can "lead to flawed results on motions for summary judgment," asking us instead to focus on the question whether "a jury [could] reasonably conclude that the employment action was made for an unlawful reason." (Appellant's Br. at 16–18.) He relies on *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th

Cir. 2016), in which we held that district courts must not eval-uate indirect and direct evidence via different "methods" in employment discrimination cases because such an approach "detract[s] attention from the sole question that matters," *i.e.*, whether a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his mem-bership in a protected class. *Id.* at 763–64.

But *Ortiz* "d[id] not concern *McDonnell Douglas* or any other burden-shifting framework." *Id.* at 766. While *McDonnell Douglas* is sometimes "referred to as an 'indirect' means of proving employment discrimination," it says nothing about how to assess different categories of evidence. *Id.* Thus, *McDonnell Douglas* is entirely consistent with our holding in *Ortiz*, *id.*, and it "remains an efficient way to organize, present, and assess evidence in discrimination cases," *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Reives is correct, though, that "[t]he determinative question in discrimination cases is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action.'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (quoting *Ortiz*, 834 F.3d at 765); *see also Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing … that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason.").

Regardless of the approach we use, however, Reives's dis-crimination claim cannot survive summary judgment. Reives contends that the fact that his partner, Kim, received a more

lenient punishment than he did supports an inference of discrimination. We disagree.

Under the *McDonnell Douglas* framework, the fourth element of a *prima facie* case requires that the plaintiff show he was treated less favorably than a similarly situated employee outside his protected class. *See Simpson*, 827 F.3d at 661. Though similarly situated employees "need not be identical in every conceivable way," they "must be 'directly comparable' to the plaintiff 'in all material respects.'" *Coleman*, 667 F.3d at 846 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). In cases like this one, where the plaintiff alleges the employer disciplined him more harshly than his comparator, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor. *Id.* at 849. "[I]n deciding whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007).

Reives and Kim were both charged with violating the ROC, but Reives received a sixty-day suspension while Kim received a three-day suspension. Reives maintains that ISP discriminated against him based on his race because he was punished more harshly than Kim for doing "exactly the same thing," as they were both initially accused of providing false information on their timecards. (Appellant's Br. at 20.)

But Reives and Kim engaged in different misconduct and were punished for violating different rules. Reives misrepresented the timing of his inspections in his reports and his memorandum, as well as throughout the investigation. He

claimed that he spent about an hour at each site and arrived at his last location at 4:00 p.m., but security footage showed him there between 2:03 p.m. and 2:12 p.m. and departing before 2:38 p.m., when he was seen driving through a tollbooth. Reives was charged accordingly with three counts related to making false statements in connection with his employment.

By contrast, Kim was more forthcoming in his memorandum. He stated that he arrived at his first location earlier than 12:00 p.m. and arrived at his last location at 2:30 p.m., and he also admitted that he attended a wake at 3:45 p.m. while still on duty. Kim was charged with failing to be efficient in the performance of his duties for attending the wake. Kim's violation carried a much more lenient recommended punishment than Reives's violations because his misconduct was deemed less serious under the ROC.

Reives maintains that our decision in *Coleman* supports his argument, but that case is inapposite. Like this appeal, *Coleman* concerned a claim of discrimination based on differential punishment of employees. *Coleman*, 667 F.3d at 847. The plaintiff was fired for violating her employer's rule prohibiting workplace violence and threats after she was believed to have conveyed threats against her supervisor to her psychiatrist. *Id.* at 843–44. Her proposed comparators were punished more leniently for violating the same rule, but they "did not break the rule in precisely the same manner"—they directly threatened another employee with a knife while at work. *Id.* at 851. We nonetheless found that the comparators "engaged in conduct that appear[ed] … at least as serious as Coleman's indirect 'threat' against [her supervisor]—and arguably even more so." *Id.* Thus, we concluded that the plaintiff had sufficiently demonstrated that her two proposed comparators were

similarly situated to her in part because they engaged in con-duct of comparable seriousness. *Id.*

Here, Reives's misconduct was deemed more serious than Kim's—his violations were considered Level 4 and Level 5 misconduct, while Kim's violation was considered Level 1 misconduct. Reives does not argue that this classification was erroneous or pretextual. Instead, he maintains that his mis-conduct was similar to Kim's. Reives tries to argue that the only difference between his conduct and Kim's was that his timeline included "approximate times that he visited his sites" rather than exact times. (Appellant's Br. at 20.) Again, Reives indicated that he arrived at his last location at 4:00 p.m., but the undisputed evidence shows that he really ar-rived sometime before 2:03 p.m., was last seen there at 2:12 p.m., and left before 2:38 p.m. As the district court found, no reasonable jury could conclude that 4:00 p.m. is "approxi-mately" the same time as 2:12 p.m. Kim was honest in his memorandum, while Reives was not. Thus, the evidence does not support an inference that the two officers engaged in "conduct of comparable seriousness." *Peirick*, 510 F.3d at 689.

In short, Reives has not shown that Kim was similarly sit-uated to him, so he cannot establish a *prima facie* case of race discrimination under the *McDonnell Douglas* approach.

Reives's claim also fails under a more straightforward evaluation of the evidence. Again, "[t]he determinative ques-tion … is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action.'" *Igasaki*, 988 F.3d at 958 (quoting *Ortiz*, 834 F.3d at 765). A court may infer discrimination when an employer treats an employee in a pro-tected class less favorably than it treats a similarly situated

employee outside that class. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). As we explained, however, Kim is not similarly situated to Reives, so the fact that he received a shorter suspension does not support an inference of discrimination against Reives. Reives presents no other evidence suggesting that his harsher punishment was because of his race. A reasonable jury therefore could not conclude that his sixty-day suspension was discriminatory.

### B. *Performance Evaluation*

Regarding the performance evaluation, the parties' arguments center on whether the downgrade of Reives's job ratings was an adverse employment action for purposes of his employment discrimination claim.

A materially adverse employment action is one where the plaintiff suffers "a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews*, 743 F.3d at 235). But "not everything that makes an employee unhappy is an actionable adverse action" because, "[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)).

Instead, adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive

discharge." *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011). "[N]egative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001).

Reives argues that ISP discriminated against him when Lieutenant Doster and Sergeant Griffin downgraded his ratings in his performance evaluation. He contends that the downgrade constituted an adverse employment action because it had the effect of reducing his future career prospects—he went from being ranked number twelve in the 2015 promotion rankings to number twenty-six in 2016, based on his downgraded evaluation. (The evaluation did not affect the financial terms of his employment because he was already being paid the same salary as a sergeant.)

But the downgrade was irrelevant because Reives was still certified for promotion in 2016. *See Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (finding that employee did not suffer materially adverse employment action because she could not "point[] to any immediate consequence of the [adverse action], such as ineligibility for … promotion"), *overruled on other grounds by Ortiz*, 834 F.3d 760. Reives emphasizes that his 2016 ranking "was a tremendous downward departure," but he does not explain how his lower ranking affected his promotion prospects. (Appellant's Br. at 15.) He also asserts that "the same rankings were used for the following year," when he was not certified for promotion, but he does not point to any evidence demonstrating that his negative evaluation in any way affected his non-certification for promotion in 2017. (*Id.*) Therefore, Reives cannot base a discrimination claim on his downgraded job ratings.

ISP contends that even if Reives has shown that he suffered an adverse employment action, there is no evidence in the record suggesting that the adverse action was discriminatory. We need not address this argument because, as we explained, the downgrade of Reives's job ratings was not an adverse action, so his discrimination claim cannot survive.

### III. CONCLUSION

For these reasons, the district court's judgment is AFFIRMED.