In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-3098

ANDREW DUNLEVY,

*Plaintiff-Appellant,*

*v.*

JAMES O. LANGFELDER, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cv-3093 — **Sue E. Myerscough**, *Judge.*

ARGUED MAY 25, 2022 — DECIDED OCTOBER 26, 2022

Before RIPPLE, ROVNER, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Andrew Dunlevy, a white man who worked as a utility water meter reader for the City of Springfield, sued Mayor James Langfelder and the City for racial discrimination after he was fired for inaccurately reporting homeowners' water meters. In support of his claims, Dunlevy compared himself to a black coworker, Tour Murray, who was not fired even though he started work late,

left early, and took unauthorized hours-long breaks during his shift. At summary judgment, the district court ruled against Dunlevy because it concluded that the conduct at issue was so different that the men were not similarly situated, leaving Dunlevy unable to establish a prima facie case of disparate punishment. We reverse because the district court drew too narrow a comparison: The two men are sufficiently similarly situated for Dunlevy to at least bring his claims to trial.

**I**

Springfield's publicly owned utility, City Water Light and Power, employs water meter readers. The utility assigns the meter readers a route to follow each month. On their routes, the meter readers visit each residential and commercial customer location, find the meter there, and enter the corresponding data into a handheld computer. There is no handbook or policy manual for meter readers; they primarily receive on-the-job training.

Meter readers, like most City employees, are subject to a twelve-month probationary period at the beginning of their employment, as required by City ordinance. Springfield, Ill., Code § 36.11 (2021). During the probationary period employees can have their employment summarily terminated. Only after the probationary period ends are employees "certified," which entitles them to certain employment protections. Meter readers work for the utility, but the mayor is the ultimate decisionmaker in all hiring and firing for the City.

In September 2017, Mayor Langfelder hired Dunlevy and Murray as meter readers. Both men received the same pay and were placed on the twelve-month probationary period.

The two men also had the same supervisory structure: they directly reported to the same supervisor, and there were five levels of supervision between them and the mayor.

Near the end of their probationary periods, both Dunlevy and Murray were the subjects of investigations into misconduct. Supervisors discovered that Dunlevy had inaccurately recorded meters at seven different homes, a practice known as "curbing meters." Whether Dunlevy did so accidentally or intentionally was of no importance to his supervisors. Two supervisors testified at a deposition that curbing meters is a fireable offense, even for protected employees. As for Murray, supervisors discovered that he had been starting work late, leaving work early, and walking off the job while on duty, sometimes for up to three hours. Murray also lied on his employment application by failing to disclose a seven-year-old burglary conviction on his self-identification form, even though the city required applicants to disclose any prior convictions. Although lying on a job application is considered a fireable offense, one witness stated that the City does not require applicants to disclose convictions that are more than seven years old. All of the supervisors who worked beneath the mayor unanimously agreed that both men should be fired, and they presented this recommendation to the mayor.

Langfelder fired Dunlevy, but not Murray. He extended Murray's probationary period by another six months. Langfelder testified that he understood that Murray's conduct involved only taking 15-minute lunch breaks, which was merely a training issue.

Dunlevy brought an equal protection claim (under 42 U.S.C. § 1983) against Langfelder and an Illinois Human Rights Act claim (under 775 ILCS 5/2-101) and a Title VII

claim (under 42 U.S.C. § 2000e) against the City for disparate punishment based on his race.[1] The mayor and the City moved for summary judgment, arguing that Dunlevy and Murray were not similarly situated therefore Dunlevy could not make a prima facie case for disparate punishment, and the district court agreed. Dunlevy now appeals that determination.

## II

We review a summary judgment decision de novo and construe the record in the light most favorable to the non-moving party. *Hall v. Nalco Co.*, 534 F.3d 644, 646 (7th Cir. 2008). Summary judgment is appropriate only when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

All three of Dunlevy's claims follow the same analysis, so they all rise or fall together. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) ("The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same."); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (adopting the "analytical framework" of Title VII cases for the Illinois Human Rights Act). Dunlevy pursues his claims under the *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual. *Purtue v. Wis. Dep't*

---

[1] Dunlevy also sued two other supervisors, but he does not appeal their dismissal.

*of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020). The parties focus only on Dunlevy's initial burden of establishing a prima facie case.

To establish a prima facie case for disparate punishment, Dunlevy must show: (1) he is "a member of [a] protected class"; (2) he met his "employer's legitimate job expectations"; (3) he suffered an "adverse employment action"; and (4) "similarly situated employees outside of the protected class were treated more favorably." *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). The parties disagree solely on the final element—whether Dunlevy and Murray are similarly situated.

The parties' dispute on appeal ignores an initial snag in Dunlevy's claims. Because this is a reverse discrimination case (as Dunlevy is a member of a majority group), "the first prong of the *McDonnell* test cannot be used," and Dunlevy cannot simply succeed by showing he is of a certain race. *See Gore v. Indiana Univ.*, 416 F.3d 590, 592 (7th Cir. 2005) (citation omitted). Rather, Dunlevy must provide evidence of "background circumstances … show[ing] an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 574 (7th Cir. 2021); *see also Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999). Dunlevy suggests that Langfelder and the City had a reason for discriminating against whites because the mayor "was very concerned about minority hiring numbers." But that only shows that the mayor was concerned with minority hiring and retention—it does not support an inference that the mayor was intentionally discriminating against white employees. Regardless, we do not

decide this issue because the mayor and the City rest solely on the similarly situated element before the district court and this court, so they have waived any argument on this front. *See Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 451 (7th Cir. 2021) (citations omitted).

Employees are similarly situated if they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (citation omitted). "This is not a 'magic formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (citation omitted). If a comparator engaged in equivalent or more egregious conduct than the plaintiff but received a lighter punishment, or none at all, that satisfies the inquiry. *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005). The parties agree that Dunlevy and Murray had the same supervisor and were subject to the same standards. Thus, the only question is whether the two men's conduct was of "comparable seriousness," *i.e.*, did they engage in "similar—not identical—conduct to qualify as similarly situated." *Coleman*, 667 F.3d at 850–51 (citations omitted).

Dunlevy suggests two bases for why Murray is an appropriate comparator. First, Dunlevy contends that Murray's repeated disregard for his work hours rose to the same level of seriousness. This argument echoes our decision in *Ezell*. There, the United States Postal Service fired a white man for taking a single extended lunch break and identified a black employee who lost a piece of mail and was not disciplined.

*Ezell*, 400 F.3d at 1050. We held that because the USPS's "primary business is delivering mail," it logically followed that misplacing mail "would also be a serious offense, at least as serious as taking a long lunch." *Id.*

Here, the utility's core business is providing utilities to the residents of Springfield, and the core function of a meter reader is to accurately read and report customers' usage. Dunlevy repeatedly curbed the meters of multiple residential customers, costing both them and the utility time and money. No doubt, Dunlevy's conduct was serious in the eyes of the utility and Langfelder. But the same could be said of Murray. A reasonable factfinder can infer that an employee taking unauthorized leave for multiple hours every day is engaging in serious misconduct. After all, an employee who simply fails to show up to work undermines the utility's core mission just as much as an employee who shows up but periodically does a poor job.

We have repeatedly warned that courts should not draw the question of similarly situated too narrowly. "Comparators need only be similar enough to enable 'a meaningful comparison.'" *Coleman*, 667 F.3d at 848. A white plaintiff suing for discrimination need not find "a non-Caucasian employee who committed exactly the same infraction and was treated more favorably." *Ezell*, 400 F.3d at 1050; *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976) (citation omitted) ("[P]recise equivalence in culpability between employees is not the ultimate question…"). The north star in the similarly situated inquiry has always been whether the two employees "engaged in conduct of comparable seriousness." *Coleman*, 667 F.3d at 851 (citation omitted). On the facts of this case, Dunlevy's meter curbing undermined the core function

of the utility, and Murray's tardiness and absences under-mined a basic tenet of any employment: be present.[2]

Dunlevy also points to Murray's burglary conviction. But a biographical fact does not make Murray similarly situated—we look only to conduct. *See id.* at 850–51. Dunlevy therefore notes that Murray indicated he was never convicted of a crime on the self-identification form that was part of his job application. While there is evidence that lying on a job application is grounds for termination, evidence also suggests that the City is not concerned with convictions that are seven years old. Moreover, unlike abandoning one's post for hours on end, a

---

[2] We cannot agree with the dissenting opinion's suggestion that our court has determined that lying to one's employer is *per se* a more serious infraction than other irresponsible workplace conduct. Each of the cases the dissenting opinion cites for this implied proposition is distinguishable from our facts in a key manner: the record in each case contained independent evidence about the employer's own view of the comparative seriousness of violations. In *Reives v. Illinois State Police*, 29 F.4th 887, 892-93 (7th Cir. 2022), the plaintiff and his comparator violated different rules, which carried different punishments—all codified in the state police's Rules of Conduct. That internal variation led our court to find the conduct at issue was not comparably serious. *Id.* In *Hiatt v. Rockwell International Corporation*, 26 F.3d 761 (7th Cir. 1994), our court never reached the question of whether alcohol infractions were more or less serious than falsification offenses; in fact, we described Hiatt's attempted comparison as "incomplete or arbitrary." *Id*. at 771. For this reason, one cannot read into *Hiatt* a rule about the comparative seriousness of deception versus other infractions. Lastly, in *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005), a third employee had been disciplined for delaying mail delivery. This evidence of the employer's own general course of conduct allowed us to make an inference about which transgressions the employer considered serious; we did not establish a bright-line rule governing future cases. Here, by contrast, we have minimal guidance in the record about which infractions the City generally perceives as more or less serious.

misstatement about an old conviction does not directly undermine the core duties of a meter reader or the utility's function. Regardless, we need not decide whether Murray's misrepresentation renders him similarly situated because he is already an adequate comparator based on his repeated act of walking off the job while on duty.

One final note is in order. Langfelder argues that he never personally met Dunlevy or Murray, so he did not know their races when he made his decision. *See, e.g.*, *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 827 (7th Cir. 2014) (race discrimination claim failed because plaintiff "acknowledged that none of those involved in the hiring process … knew the race of the applicants when evaluating and grouping the applications," among other reasons). But the City asks every job applicant to fill out self-identification forms, which includes a question about their ethnicity. These forms were part of their personnel files that the mayor reviewed. A jury could thus reasonably infer that Langfelder was aware of their races.

### III

Because Murray's tardiness and absences are of comparable seriousness to Dunlevy's meter curbing for purposes of the *McDonnell Douglas* burden-shifting framework, we VACATE the district court's decision and REMAND for further proceedings.

RIPPLE, *Circuit Judge*, dissenting. Andrew Dunlevy sued Mayor Langfelder and the City of Springfield for racial discrimination after he was terminated from his position as a water meter reader for City Water Light and Power ("CWLP") before the end of his probationary period. The City, acting through Mayor Langfelder, premised this termination on Mr. Dunlevy's falsification of meter readings, a practice known as "curbing meters." To support his disparate treatment claim, Mr. Dunlevy, a white man, compares himself to Tour Murray, a Black water meter reader whose probationary period was extended after the City discovered unauthorized gaps in his workdays. The majority concludes that Mr. Murray's tardiness and absences are of comparable seriousness to Mr. Dunlevy's meter curbing for purposes of establishing a prima facie case of disparate punishment under the *McDonnell Douglas* burden-shifting framework. *See* Majority Op. 9. In my view, the two men's conduct is not comparably serious because tardiness and absences do not undermine the core business of CWLP to the same extent as falsifying meter readings. I therefore respectfully dissent.

Mr. Dunlevy alleges disparate punishment by Mayor Langfelder and the City based on his race. To establish a prima facie case for disparate punishment under the well-established burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Mr. Dunlevy must show: (1) he was a member of a protected class; (2) he was meeting the City's legitimate job expectations; (3) he was subjected to a materially adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007). Here, the only dispute among the parties arises under the

fourth prong: whether Mr. Dunlevy and Mr. Murray are similarly situated.

Mr. Dunlevy must show that Mr. Murray's conduct is sufficiently similar "to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). "[P]recise equivalence in culpability between employees is not the ultimate question." *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). But the "similarly situated employees must be directly comparable to the plaintiff in all material respects." *Id.* at 846 (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)) (cleaned up).

"In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). Here, again, the first two factors are not in dispute. Mr. Dunlevy and Mr. Murray were hired at essentially the same time, had the same title, answered to the same chain of command, were subject to the same standards of conduct, and performed the same job. As for the third factor, "[t]o determine 'whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness.'" *Id.* at 851 (quoting *Peirick*, 510 F.3d at 689).

No reasonable factfinder could infer from the facts of this case that Mr. Murray and Mr. Dunlevy engaged in conduct of comparable seriousness. Mr. Dunlevy falsified meter

readings for at least seven different homes and therefore directly harmed CWLP customers. His misconduct included charging a vacant house for water use and causing another customer to be required to pay $500 in a single bill. Mr. Murray, in contrast, took unauthorized breaks during the workday. Although Mayor Langfelder testified that he had understood Mr. Murray's misconduct to consist of extending his lunch breaks by fifteen minutes, an internal CWLP memorandum reported large gaps in Mr. Murray's daily work, including nearly three hours of downtime in addition to starting his workdays late and ending early.

Under our case law, Mr. Dunlevy's falsification of meter readings is a more serious transgression than Mr. Murray's slacking off on the job. In *Reives v. Illinois State Police*, 29 F.4th 887 (7th Cir. 2022), for example, we recognized that dishonesty to one's employer is a more serious offense than inefficiency in the performance of one's duties. In that case, two Illinois state troopers had been assigned identical inspection assignments and both had to submit a report after their supervisors became suspicious of their work activities. *See id.* at 890. One trooper lied about his hours and activities; the other told the truth, admitting to cutting the day short to attend a wake while on duty. *See id.* Both officers were charged with violating the Rules of Conduct, but one received a sixty-day suspension for his misrepresentations while the other was suspended for three days for "failing to be efficient in the performance of his duties for attending the wake." *Id.* at 892–93. We concluded that the officers had not engaged in conduct of comparable seriousness. *See id.* at 893.

In *Hiatt v. Rockwell International Corp.*, 26 F.3d 761 (7th Cir. 1994), we similarly suggested that the submission of false

information by an employee is more serious than certain other irresponsible workplace misconduct. There, a plaintiff was terminated for falsifying a receipt that he submitted for reimbursement. *See id.* at 763–64. The plaintiff claimed that his employer's reason for firing him was pretextual and argued that he received disparate treatment because he had filed workers' compensation claims, citing two other employees who were not terminated for alcohol-related offenses. *See id.* at 771. We concluded that "[a]lcohol-related offenses are not the same type of misconduct as falsification of records" and therefore the plaintiff was not "similarly situated with these other employees for purposes of a relevant comparison." *Id.*

Contrary to the majority's suggestion, *Ezell v. Potter*, 400 F.3d 1041 (7th Cir. 2005), does not support the conclusion that Mr. Murray's misconduct was comparably serious to Mr. Dunlevy's. In *Ezell*, we held that a postal worker who was disciplined for taking an extended lunch break could point to the case of another postal worker who had lost a piece of certified mail but had not been disciplined. *See id.* at 1050. We allowed the comparison because the record also revealed that a third employee who had delayed the mail had been disciplined, thus establishing that the Postal Service regarded misconduct compromising the integrity of the mail delivery system as a serious matter. *See id.* In short, because the Postal Service's "primary business is delivering mail" and there was "evidence in the record that another carrier was fired for delaying mail," we could "infer that losing mail would also be a serious offense, at least as serious as taking a long lunch." *Id.*[1]

---

[1] In *Ezell*, the plaintiff also presented evidence that the supervisor, who was not disciplined, had doctored employees' time records, which

The majority, relying on *Ezell*, concludes that a reasonable factfinder could infer that an employee taking unauthorized leave "is engaging in serious misconduct" on par with meter curbing because "meter curbing undermine[s] the core function of the utility," while "tardiness and absences undermine[] a basic tenet of any employment: be present." Majority Op. 7–8. However, our conclusion in *Ezell* that undermining an employer's primary business is "at least as serious as taking a long lunch," *Ezell*, 400 F.3d at 1050, does not support the reverse inference in this case that unapproved absences are as serious as undermining CWLP's primary business of providing, and accurately reporting and charging for, utilities.[2] *Ezell* did not suggest that extended lunch breaks or other such unauthorized absences, on their own, undermine an employer's primary business. It simply held that if an employer had not disciplined an employee who had interfered with the business's core function, a factfinder could consider its disciplining of an employee for an act that did not affect the core function as some proof of discrimination.

Even if the conduct of the two men were sufficiently comparable for Mr. Dunlevy to make out a prima facie case of disparate punishment, that would merely mean that the burden

---

amounted to falsifying records and violated the Fair Labor Standards Act. *See Ezell*, 400 F.3d at 1050. We concluded that the offense was "arguably very similar" to the conduct that led to the plaintiff's termination and reiterated that the plaintiff had sufficient evidence to survive summary judgment. *Id.*

[2] Notably, although meter curbing was an offense warranting discharge, even for protected employees, there is no evidence in the record that unauthorized absences or tardiness were treated similarly seriously by CWLP.

shifts to the City "to provide a legitimate, non-discriminatory reason for the action." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (quoting *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000)). Mayor Langfelder, as the decisionmaker, can be mistaken about the facts in his termination decision, as long as the "mistake" is not a pretext for animus. *See id.*

Mr. Dunlevy presents no argument that Mayor Langfelder's explanation for his decisions is pretextual. Mayor Langfelder considered Mr. Murray's slacking off, but not Mr. Dunlevy's meter curbing, to be merely a "training issue" that could be solved through an extended probationary period.[3] Mayor Langfelder also assumed that the City's Human Resources Department had "vetted" Mr. Murray's conviction history and had approved his employment, despite that conviction, prior to hiring him.[4] He felt no need to second guess that assessment a year into Mr. Murray's tenure with the City. There is no reason to believe that these non-discriminatory explanations are not legitimate.

The unanimous recommendation by supervisors under Mayor Langfelder that both Mr. Dunlevy and Mr. Murray be terminated is not evidence that Mayor Langfelder's explanation is pretextual. Under the City's employment scheme, the ultimate decision-making authority over both Mr. Dunlevy and Mr. Murray rested with Mayor Langfelder, an elected official who could take a broader view of City administration when making employment decisions. It is unsurprising that the Mayor balanced the competing considerations of the

---

[3] R.23-7 at 30:18–22.

[4] *Id.* at 33:13–34:18; *see also id.* at 35:3–5.

employment decision in a manner different from supervisors who might bear the day-to-day brunt of training a slacking employee.

Although we must "resist the temptation to act as jurors when considering summary judgment motions," we also must not "sit as a 'super-personnel department,' second-guessing an employer's 'business decision as to whether someone should be fired or disciplined because of a work-rule violation.'" *Coleman*, 667 F.3d at 862 (quoting *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006)). In this case, Mayor Langfelder, as the decisionmaker, made a permissible mayoral decision in distinguishing between the misconduct of Mr. Dunlevy and of Mr. Murray. Mr. Dunlevy's affirmative dishonesty went to the heart of the function for which he was hired and directly harmed CWLP customers. On the other hand, the more passive activity of Mr. Murray, while delaying the performance of his duties, nevertheless did not directly impair the function of CWLP and could be remedied by the easily implemented extension of his probationary period.

For the foregoing reasons, I would affirm the judgment of the district court and therefore respectfully dissent.