In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1332

RUFUS WEST, also known as Mansa Lutalo Iyapo,

*Plaintiff-Appellant,*

*v.*

JARED HOY,[1] in his official capacity as
Secretary of the Wisconsin Department of Corrections,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:17-cv-00335 — **William M. Conley**, *Judge.*

ARGUED DECEMBER 2, 2022 — DECIDED JANUARY 22, 2025

Before EASTERBROOK, SCUDDER, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Rufus West, also known as Mansa Lutalo Iyapo, is an inmate at Green Bay Correctional Institution

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Jared Hoy, who was appointed as the Secretary of the Wisconsin Department of Corrections on May 24, 2024, is automatically substituted for Kevin Carr.

in Wisconsin and a practicing Muslim. He filed suit under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5, challenging the Wisconsin Department of Corrections's ("WDOC") policy of prohibiting inmates from leading religious programs even when no outside religious leader or volunteer is available. As he sees it, this policy results in the unnecessary cancellation of religious programs in the absence of an outside leader or volunteer. West also claims that the cancellation of these programs breached a settlement agreement that he had negotiated with WDOC to resolve a prior lawsuit.

The district court granted summary judgment in WDOC's favor as to the RLUIPA claim, and we affirm that aspect of the decision. With respect to West's state law breach-of-contract claim, the district court granted West's motion for summary judgment as to liability, but relinquished supplemental jurisdiction over his request for injunctive relief. Title 28 section 1367(c) of the United States Code, however, requires that, when a district court exercises its discretion to relinquish jurisdiction over a state law claim, it must let go of the entire claim, not just the remedy. Accordingly, we vacate the partial judgment on the state law claim and remand so that the district court can determine, in its discretion, whether it wishes to retain or relinquish jurisdiction over the entire claim.

## I. Background

### A. West and the Prior Lawsuit

As a Muslim man, West is required by the Koran to attend Jumu'ah congregational prayer services just after 12:00 p.m. every Friday. Jumu'ah begins with a sermon and ends with a prayer service. The Koran also mandates that Muslim men,

like West, participate in Talim, a study group where Muslims learn the teachings of the Koran as well as the Hadith, Islamic prayers, and the Arabic language. Talim is a central component of a Muslim's religious development. There is no requirement that it occur on a specific day or at a specific time, but the Koran teaches that Talim should be observed at least on a weekly basis. According to West, he is qualified to lead Jumu'ah and Talim.

The WDOC, however, has a policy prohibiting inmates from leading religious gatherings of fellow inmates. And so, it proscribed West from leading Jumu'ah and Talim. As a result, he filed suit against the Secretary of WDOC in 2011, alleging, among other things, that WDOC's prohibition of inmate-led religious programming substantially burdened his exercise of religion in violation of RLUIPA. *See West v. Grams*, 607 F. App'x 561 (7th Cir. 2015).

The district court dismissed the RLUIPA claim as moot after West was transferred to another facility. West appealed, and we concluded that this determination was erroneous, vacated the dismissal, and remanded for further proceedings as to that claim. *Id.* at 567.

In September 2016, the parties entered into a settlement agreement to resolve the lawsuit. The agreement states: "Defendants agree that routinely scheduled congregate religious programming, including Friday services (Jumu'ah), weekly study groups (Talim), and Eid al-Fitr prayer will not be canceled for the lack of having a community volunteer or DOC Chaplain of that faith available to lead the event(s)[.]" The agreement provided WDOC with ninety days to meet the conditions.

**B. WDOC's Religious Programming**

WDOC provides religious-practices programming for thirty-six facilities with varying security levels, inmate populations, and rehabilitation objectives. The facilities also have differing physical plants, staffing, and community resources. In all, WDOC oversees approximately 108 Islamic programs and 108 Catholic programs on a monthly basis. WDOC also facilitates religious programs for six other faith groups, which it classifies as Eastern Religions, Humanism-Atheism-Agnosticism, Judaism, Native American-American Indian Religions, Paganism, and Protestantism-Other Christianity.

On October 24, 2016, a month after entering into the settlement agreement with West, WDOC promulgated Policy 309.61.01, entitled "Congregate Religious Event Conduct" (the "Policy"). The Policy retains the general prohibition against inmate-led religious programming, requiring congregate religious services to be facilitated by either a chaplain of that faith or a qualified volunteer from the community. For instance, Jumu'ah must be facilitated by an Imam, and activities related to a Native American/American Indian sweat lodge must be facilitated by a recognized spiritual leader. Study groups are treated less strictly; they can be supervised by a volunteer, chaplain, or other staff member. In a nod to the settlement agreement, however, the Policy does provide that, when a chaplain, supervising staff member, or a volunteer is not available, WDOC staff should try to offer alternative religious programming rather than canceling them outright.

### 1. Prohibition of Inmate-led Programs

According to WDOC, the prohibition of inmate-led religious gatherings serves several important goals. First, it prevents inmates from using leadership positions to facilitate subversive or illegal activities. Indeed, prior to 2001, inmates were permitted to lead religious services, but the WDOC discovered that some of the inmate leaders were using the gatherings to target certain races or gangs. Some inmate leaders also used their positions to coordinate drug deals, extortion, or attacks on other inmates or staff.

Furthermore, WDOC contends, allowing an inmate to lead other inmates bestows upon them a quasi-staff status, thereby undercutting the authority of the regular prison staff and causing security concerns. And when inmate leaders assume a pastoral role over other inmates, WDOC believes, they can use the information they gain to manipulate or exert pressure on fellow inmates to extort money or services.

Finally, the prohibition also prevents unnecessary competition and tension among inmates vying for these leadership positions.[2] And, unlike inmate leaders, non-inmate leaders are more willing and able to enforce compliance with and

---

[2] A March 2020 report issued by the U.S. Department of Justice, entitled "Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization," discussed an email written by an inmate in federal prison to a foreign organization with information about power struggles among inmates. According to the report, the inmate's email described multiple inmates competing for leadership positions in various religious groups.

report violations of prison rules, thereby promoting prison security and inmate safety.

## 2. Alternative Programs

While WDOC tries to offer the same type and breadth of religious programming provided in the community, this is not always possible, particularly when an outside religious leader or volunteer is not available to come to the prison. In such instances, the Policy encourages WDOC staff to adjust the programming in certain ways, rather than canceling altogether. *Id.* For instance, the Policy provides that a chaplain or a staff member can oversee the gathering of inmates of a different faith. When performing such a role, the chaplain or staff member can ask certain inmates to perform the various religious functions, such as calling prayer, carrying the pipe, singing in choir, or reading a designated passage, so long as the participants are chosen in a random and equitable manner. Staff can also organize teaching videos and congregate discussions led by a chaplain or staff member as well as coordinate live video feeds of programming from other WDOC facilities.

For example, due to the unavailability of a qualified volunteer or Muslim chaplain at Green Bay Correctional Institution, the prison has been offering Jumu'ah via live video stream from another facility, where a Muslim chaplain is on staff. Using such alternatives, Green Bay Correctional Institution has not had to cancel any Islamic services or study groups due to the lack of a community or staff volunteer (with the exception of 2020 when the facility implemented strict COVID-19 restrictions).

## C. The Proceedings Below

On May 5, 2017, West filed a second lawsuit, which is the subject of this appeal. In it, he alleged that, by prohibiting inmate-led religious programming, offering alternative programs such as live video feeds, and canceling six Talim study groups, WDOC violated RLUIPA, as well as the terms of the prior settlement agreement.

WDOC moved for summary judgment, arguing that its policies provide the least restrictive means to further the compelling interests it has in promoting prison safety and security. For his part, West requested summary judgment on his RLUIPA claim and partial summary judgment as to liability on his breach-of-contract claim.

Regarding the RLUIPA claim, the parties agreed that the challenged practices placed a substantial burden on West's ability to participate in Muslim religious programs. As a result, the district court concluded that West had satisfied his initial burden to establish that these practices imposed a substantial burden on his exercise of religion. Next, the district court recognized that WDOC had a compelling governmental interest in maintaining prison safety and security. Lastly, the district court concluded that West had failed to adduce any evidence to undermine WDOC's assertions that hiring qualified religious leaders for the six-designated faith groups at its thirty-six facilities was cost-prohibitive. Nor did West offer any facts refuting WDOC's justifications for curtailing inmate-led religious activities in the first place. The district court therefore granted summary judgment in favor of WDOC as to the RLUIPA claim.

As for West's state law breach-of-contract claim, the district court declined the WDOC's request to relinquish supplemental jurisdiction over the claim and concluded that the prison had violated the plain language of the prior settlement agreement by canceling Talim six times in September 2016. As a result, the court granted West's motion for partial summary judgment as to liability. But when it came to West's request for an injunction compelling WDOC to allow inmate-led religious programming, the district court questioned whether the Prison Litigation Reform Act allowed it to grant such broad relief, citing 18 U.S.C. § 3626(a)(1)(A).[3] In the end, the court decided to relinquish jurisdiction on the question of whether an injunction was appropriate and dismissed only that portion of the state law claim without prejudice.

---

[3] This provision states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

## II. Standards of Review

"We review a summary judgment decision *de novo* and construe the record in the light most favorable to the nonmoving party." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

Where a district court dismisses all claims over which it has original jurisdiction, its decision to exercise or relinquish supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(c) is reviewed for an abuse of discretion. *Refined Metals Corp. v. NL Indus. Inc.*, 937 F.3d 928, 935 (7th Cir. 2019). "[W]e will reverse the court's decision … 'only in extraordinary circumstances.'" *In re Repository Techs., Inc.*, 601 F.3d 710, 724–25 (7th Cir. 2010) (quoting *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001)).

## III. Discussion

### A. The RLUIPA Claim

On appeal, West argues that the district court improperly granted summary judgment to WDOC on his RLUIPA claim.

RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that

compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[4]

"In establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion." *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). If the plaintiff makes this showing, the burden shifts to the defendants to show "their practice is the least restrictive means of furthering a compelling governmental interest." *Id.* (internal quotation marks omitted). This standard is "exceptionally demanding" and requires a defendant, like WDOC, to show that "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

In enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with

---

[4] RLUIPA only provides for injunctive relief. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). And, because the available remedy is explicitly equitable, there is no Seventh Amendment right to a jury trial. *See Curtis v. Loether*, 415 U.S. 189, 193 (1974).

consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (internal quotation marks omitted). "Concerns of security are to be given particular sensitivity." *Koger*, 523 F.3d at 800 (internal quotation marks omitted). And when "inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726. That said, a court must carefully weigh the competing interests and not grant "unquestioning deference" to the views of prison officials. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015).

Here, the parties agree that West has satisfied his initial burden. The parties also agree that WDOC has a compelling governmental interest in maintaining prison safety and security. The only issue before us is whether the Policy provides the least restrictive means of furthering this compelling governmental interest.

West raises several arguments as to why the Policy is excessive. First, he contends that WDOC can and should hire enough employees to ensure that all inmates of any religion are able to practice their religion in accordance with the tenets of their faith. But, in order to do so, WDOC would have to hire 152 individuals on at least a halftime basis (assuming it could find enough qualified candidates to lead the religious groups at its numerous and widely dispersed institutions). And paying these employees at even half the rate of a typical prison chaplain would cost WDOC approximately $4,712,000 annually. Given its limited budget, requiring WDOC to take this step is simply unrealistic and would deplete funds earmarked for other important prison needs.

Next, West asserts that WDOC should make an effort to recruit additional outside volunteers to lead religious services. The record shows, however, that WDOC consistently tries to recruit new religious volunteers and to accommodate existing ones. For instance, WDOC encourages inmates to identify community religious leaders for consideration and follow-up. And it offers honoraria and reimbursement for mileage to community leaders who do volunteer.

Green Bay and Redgranite Correctional Institutions are illustrative of WDOC's efforts. At Green Bay, Chaplain Donovan successfully recruited a Jumu'ah volunteer, as well as a substitute volunteer in the event that the first is unavailable. If neither of these volunteers can be present to preside, Donovan selects an inmate to read a pre-approved designated sermon to the group. Afterwards, the group says their ritual prayer. Donovan also has a volunteer for Talim. When that volunteer is unavailable, Donovan asks an inmate to read an approved religious text, and the group of inmates engages in an open discussion while Donovan supervises. At Redgranite, Chaplain Aberg has successfully recruited a regular volunteer to lead Jumu'ah followed by Talim on the same day. West offers nothing to indicate that these examples are the exception rather than the rule.

West also argues that WDOC can formulate a less restrictive way to achieve its security interests, while still allowing inmates to lead religious programming. But West has presented nothing to rebut WDOC's evidence that allowing inmates to lead religious programs will create significant security risks. West does provide examples of policies from the Federal Bureau of Prisons and twenty state prisons that purport to allow inmates to lead religious services or programs

in some limited fashion. But West fails to cite any particular page, section, or language within these policies to support his contention. Nor does he analyze how these policies might address the security breaches that WDOC has encountered in the past.

Finally, West contends that inmates had led Jumu'ah and Talim sixteen times over the course of approximately five years at Green Bay, all without incident. But, assuming these facts to be true, these instances took place under the current Policy, and the lack of incident could be due to the Policy's requirement that inmates be selected at random and follow a pre-approved program or topic of study. West presents nothing to indicate otherwise.

In short, the district court correctly concluded on this record that WDOC's Policy is the least restrictive means of achieving its goal of maintaining prison safety and security.[5] Thus, we affirm the entry of summary judgment in WDOC's favor as to West's RLUIPA claim.

---

[5] It is worth noting that inmates suing under RLUIPA in other cases have *requested* video access to Jumu'ah services and Talim study groups as a way to satisfy their religious obligations. *See, e.g.*, *Greenhill v. Clarke*, 944 F.3d 243 (1st Cir. 2019); *Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009); *DePaola v. Ray*, No. 7:12CV00139, 2013 WL 6055253 (W.D. Va. Nov. 15, 2013).

**B. Contract Claim**

West also challenges the district court's decision to relinquish supplemental jurisdiction over the relief portion of his state law contract claim after granting summary judgment in his favor as to liability.[6] A district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). That said, it "may decline to exercise supplemental jurisdiction over a claim under subsection (a)" if the district court "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3).

Here, the district court ruled in West's favor on his breach-of-contract claim as to liability but decided to relinquish supplemental jurisdiction as to the appropriate remedy. To determine whether this was an abuse of discretion, we need to decide the meaning of "claim" as it appears in § 1367(a).

In doing so, "our job is to interpret the words consistent with their ordinary meaning … at the time Congress enacted

---

[6] To the extent West believes that the district court that had adjudicated his first lawsuit retains jurisdiction to enforce the settlement agreement after that case was dismissed, this is incorrect. A district court may retain jurisdiction to enforce a settlement agreement after dismissing the case in one of two ways: (1) it can dismiss the case without prejudice and expressly retain jurisdiction over the settlement agreement; or (2) it can incorporate the settlement agreement into the judgment. *Jones v. Ass'n of Flight Attendants-CWA*, 778 F.3d 571, 573 (7th Cir. 2015). Neither method was employed in this case.

the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (internal quotation marks omitted). "Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).

Although § 1367 does not expressly define what it means by "claim," the provision does refer to "claims … under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure" and "claims … under Rule 19." 28 U.S.C. § 1367(b). Furthermore, later in that paragraph, it speaks of "supplemental jurisdiction over *such* claims." *Id.* (emphasis added). The problem is that, although the word "claim" appears in multiple places throughout the Rules, no definition appears there either.

Turning then to external sources, at the time of § 1367's enactment, Black's Law Dictionary offered "cause of action" as a definition for "claim," Claim, Black's Law Dictionary (6th ed. 1990), and in turn defined "cause of action" as "[a] situation or state of facts which would entitle party to sustain action and give him right to seek a judicial remedy in his behalf," Cause of Action, Black's Law Dictionary (6th ed. 1990). *See Oneida Tribe of Indians of Wis. v. State of Wisconsin*, 951 F.2d 757, 761 (7th Cir. 1991) ("Federal courts regularly turn to general and technical dictionaries to determine the plain meaning of a word or phrase.").

Defining a "claim" as an underlying set of facts that gives a claimant the right to a legal remedy is consistent with how we have treated the term "claim" in similar contexts. For example, in *St. Augustine School v. Underly*, we defined a "claim," as "the set of operative facts that produce an assertable right in court and create an entitlement to a remedy." 78 F.4th 349, 352 (7th Cir. 2023). We distinguished this from "a

theory of relief," which "is the vehicle for pursuing the claim; it may be based on any type of legal source, whether a constitution, statute, precedent, or administrative law. The specific theory dictates what the plaintiff needs to prove to prevail on a claim and what relief may be available." *Id.*; *see Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 815 (7th Cir. 2024) (rejecting, in the context of 28 U.S.C. § 1441(c)(1), the proposition that each legal theory is a separate "claim").

This definition of "claim" makes sense as that term appears in § 1367(a). *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (noting that, under § 1367(a), "judicial power to hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts"). It makes less sense, however, in the context of § 1367(c), which seems to use "claim" in a manner more akin to "a legal theory of relief." *See, e.g.*, § 1367(c)(1) (bestowing upon the district court the discretion to decline supplemental jurisdiction if "the claim raises a novel or complex issue of State law").

Fortunately, we need not arrive at a precise definition in this case, because whatever a "claim" is, it is not the particular remedy a claimant seeks. Here, the district court entered final judgment as to WDOC's liability for breach of contract, but relinquished supplemental jurisdiction as to the appropriate remedy, citing § 1367(c). But that provision only authorizes a district court, in its discretion, to relinquish supplemental jurisdiction over a "claim." Because a plaintiff's prayer for relief does not comprise a "claim" under any definition, the district court abused its discretion by entering judgment as to liability, but renouncing supplemental jurisdiction over the

remedy. *See United States v. Chaparro*, 956 F.3d 462, 474 (7th Cir. 2020) ("[A] legal error is an abuse of discretion by definition.") (internal quotation marks omitted). Accordingly, we remand this case to the district court so that it may exercise its discretion to determine whether it should retain or decline supplemental jurisdiction over the state law breach-of-contract claim.

## IV. Conclusion

For the reasons above, we AFFIRM the judgment in WDOC's favor as to West's claim under RLUIPA. As for the state law contract claim, we VACATE the judgment as to liability and REMAND so that the district court may determine whether it wishes to exercise its discretion to retain or relinquish supplemental jurisdiction over the claim.