In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1659

JAMES NAPIER,

*Plaintiff-Appellant,*

*v.*

ORCHARD SCHOOL FOUNDATION,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-03556 — **Sarah Evans Barker**, *Judge.*

———————————

ARGUED SEPTEMBER 5, 2024 — DECIDED MAY 16, 2025

———————————

Before EASTERBROOK, KIRSCH, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* James "Jamie" Napier was the Director of the Middle School at the Orchard School. In 2018, Orchard hired Dr. Sherri Helvie as Head of School. About eight months later, on Helvie's orders, Orchard declined to renew Napier's contract for the following school year. In response, Napier filed an employment discrimination suit against Orchard, alleging that he was terminated because of his sex.

Napier also reapplied for his position, and after Orchard rejected him, he added a retaliation claim to this litigation.

The district court granted summary judgment for Orchard on both claims. We affirm.

## I. Background

The Orchard School is a private school in Indianapolis that is divided into an Early Childhood and Elementary School and a Middle School. Orchard hired Jamie Napier as the Director of the Middle School in 2016.[1] Napier is a man, and at that time, so were the other three members of Orchard's senior leadership: Head of School Tom Rosenbluth, Assistant Head of School Nick Eble, and the Director of the Early Childhood and Elementary School, Hal Schwartz.

In 2017, Orchard informed Rosenbluth that they would not renew his employment contract, and Orchard began searching for a new Head of School. During the process, a consultant hired by Orchard fielded concerns from members of Orchard's Board that a male Head of School would encounter difficulty in the job. The consultant noted that the existing leadership team had a "frat boy" perception among Orchard's predominantly female faculty. Indeed, when Napier was hired the preceding year, there were "strong feelings" about not hiring him because he was "simply one more white male." Race and sex were undoubtedly at issue in the Head of School search, yet they were not a "determining factor" in whether an applicant was selected.

In the end, Orchard chose Dr. Sherri Helvie, a woman. Helvie had previously served as Assistant Head of School for

---

[1] Napier previously taught at Orchard from 1996 to 2003.

a private school in California, and she held a B.A. in English with a minor in Women's Studies, an M.A. in English with emphases in Women's Literature and Critical Theory, and a Ph.D. in Literature with notation in Women's Studies.

Helvie became Head of School in July 2018, and she immediately made changes. According to Orchard, Helvie inherited the organizational structure developed by her predecessor, which included two leadership teams, the Senior Administrative Team and Academic Leadership Team. Helvie, however, removed Napier and Schwartz from the Senior Administrative Team and replaced them with two new members, Jennifer Bostrom, the Director of Institutional Advancement, and Courtney Williams, the Chief Financial Officer. Following the change, the Senior Administrative Team was Helvie, Eble, Bostrom, and Williams, whereas the Academic Leadership Team was Helvie, Eble, Napier, and Schwartz. Although his compensation and daily job duties stayed the same, Napier perceived the shift as a demotion because it meant he was less involved with Orchard's high-level strategy. Also, Helvie told Napier to report to her through Eble, and Napier felt that having Eble as a go-between hampered his ability to build a relationship with Helvie.

The first incident between Helvie and Napier was in October 2018, when an English teacher announced that she intended to retire. Napier was interested in replacing her with a specific teacher employed by another school, and he raised this candidate with Helvie, who said that she wanted to talk to the teacher's head of school. Napier then told the director of human resources that Orchard should post an opening online to accumulate a broader set of applications. After the opening was posted, Helvie was displeased and instructed

Eble to take it down. Napier testified that he was never instructed not to post an opening online, and that he did not see the issue with collecting a pile of applications.

A second, bigger problem arose in the winter. Helvie began considering whether to eliminate the Middle School Coordinator and Elementary School Coordinator positions, which were held (respectively) by Angela Brothers and Gretchen Bricker. Orchard was under a budget crunch, and Helvie was concerned that the coordinator roles were vaguely defined, so she requested that Napier and Schwartz put together updated job descriptions to help her decide if the positions should be retained.

The parties dispute whether Helvie specifically ordered Napier not to tell Brothers that he was revising her job description, but it was unquestionably a delicate subject. According to Orchard, Helvie directed Napier and Schwartz to keep the development of the new job descriptions confidential to leadership. In an affidavit, Schwartz agreed that Helvie instructed him to keep the task confidential. At his deposition, Napier testified that Helvie did not provide an explicit confidentiality instruction (which he also stated in his affidavit), or say that the topic was "of uber secrecy," but he acknowledged that Helvie would usually end leadership meetings by reminding everyone that "what's been talked about in here should stay in here."

Around February 2019, Brothers became worried about her job and asked Napier whether her position was in jeopardy. Napier testified he "did not lie terribly well," and "[a]ll [he] could say was if and maybe possibly," and told Brothers that "we're putting together your job description." Brothers

asked Napier if he would care if she reached out to Helvie, and he said he would not.

Shortly afterward, Napier brought Helvie a list of priorities for the Middle School Coordinator position and said that Brothers had helped him make the list. Helvie responded that she was surprised that Napier had breached her administrative confidence. Helvie added that Brothers had made an appointment with her and that she now was sure it was about Orchard's review of Brothers's position.

At the meeting with Brothers, Helvie admitted that she was taking a close look at the school's administrative positions, which included the possibility of eliminating the Middle School Coordinator position. This upset Brothers, and rumors spread that she was seen in tears after the meeting. Around the same time, Bricker became aware that her Elementary School Coordinator position was at risk and raised the topic with Schwartz.

A couple days later, on February 22, 2019, Helvie emailed the co-chairs of Orchard's Board to inform them that she planned to meet with Napier to address "his decision to breach the confidentiality of our Academic Leadership Team conversations," and to tell him that he had subjected Brothers to incredible stress and failed in his duties as supervisor and Middle School Director. Helvie wrote that Napier had "egregiously compromised [her] trust in him" and that Napier appeared to have activated a gossip network. Helvie said she was deciding what to do next.

On March 6, Helvie met with Napier and informed him that his contract would not be renewed for the following

school year.[2] Napier testified that Helvie told him: "I've lost confidence in you because you have disclosed to Angie Brothers about her job, which has caused her undue stress, and that has also bled over to Gretchen Bricker."

That same day, Helvie offered Brothers the position of Acting Middle School Director for the following school year, which she accepted. Before accepting, Brothers sought advice from Napier, who encouraged her to take the job because he did not "want this scandal to become a … fulcrum for which the school dissolved itself." Nonetheless, Napier testified that he believed Brothers was not qualified for the position.

Napier informed Eble and Schwartz that he was being terminated. Eble was surprised and said he was not involved in the decision, while Schwartz appeared relieved, which Napier attributed to Schwartz fearing that he was at risk of termination instead.

On March 7, Napier attempted to give Helvie a letter that asked her, among other things, to provide a written explanation of his termination and to rehire him. Helvie declined to take the letter from Napier, so Napier handed it to the director of human resources, who "made it clear to [Napier] that Dr. Helvie was driving the decision to dismiss [him] without considering any other options." Napier never received a written termination notice.

The next day, March 8, Helvie sent an email to the Orchard community announcing Napier's departure. Napier had declined Helvie's request to assist with the email and asked

---

[2] Napier continued to serve as Director for the remainder of the school year. The parties refer to Helvie's decision not to renew his contract as a "termination," so we follow their lead.

Helvie not to send it at all. The email praised Napier for his contributions to Orchard and did not provide a reason why he would not be returning.

In addition to terminating Napier, Helvie eliminated the Middle School and Elementary School Coordinator positions, as foreshadowed by the review of the job descriptions. Although that change did not affect Brothers, who had been promoted, it meant that Bricker would have to return to a teaching position. Bricker complained about Orchard on Facebook, and Helvie made her remove the post, but allowed Bricker to keep her teaching role if she wished.

In mid-March, Napier sent a letter to the acting chair of Orchard's Board detailing the issues he had with Helvie and contending that he should not have been terminated. After learning of Napier's termination, several Orchard faculty members and parents sent him statements of support, and some contacted the Board to express concern and disagreement. At a meeting with parents, Helvie refused to say why Napier was not coming back the following school year, but said that she "[did] not want a single person leaving this room thinking disparaging things about Jamie Napier." A later survey of Orchard parents found that many were upset that Helvie terminated Napier, with responses deeming it a "terrible decision" and several parents suggesting that Helvie should be fired instead.

The Board did not investigate Napier's termination after his letter to the acting chair, and in June 2019, Napier sent the Board a letter again criticizing his termination. He raised the prospect that his dismissal was based on sex, alleging that Eble had been repeatedly heard saying that there were "too many tall white males in charge" at Orchard. Napier

indicated that he was on the verge of pursuing litigation and asked for a meeting. The Board declined to meet with Napier.

On August 21, 2019, Napier filed his initial complaint in this case, alleging sex discrimination in violation of Title VII.

In November 2019, Orchard posted an opening for the Middle School Director position, and Napier applied. Eble oversaw the search and selection process, and although he did not know exactly why Helvie had not renewed Napier's contract, Helvie had told him that her professional relationship with Napier would not be conducive to Orchard's future. Orchard rejected Napier's application and hired Brothers to occupy the role permanently. In response to the rejection, Napier supplemented his discrimination lawsuit with a retaliation claim.

After discovery, Orchard moved for summary judgment, arguing that Napier had not presented sufficient evidence for a reasonable factfinder to conclude that Orchard discriminated against him based on his sex. Orchard likewise argued that there was insufficient evidence to support Napier's retaliation claim.

The district court granted Orchard's motion. The district court concluded that Napier had not presented a *prima facie* case of discrimination. It emphasized that Napier did not offer evidence to dispute that he breached Helvie's trust and confidence through his disclosures to Brothers. The district court thus held that "no genuine issue of material fact exists regarding whether Napier's sex was the reason for and the cause of his termination of employment." Similarly, the district court held that Napier had not raised a triable retaliation claim because the record showed no connection between

Napier's protected activity and his rejected application. Napier now appeals.

## II. Analysis

We review a district court's grant of summary judgment *de novo. Reives v. Illinois State Police*, 29 F.4th 887, 891 (7th Cir. 2022). We construe the record in the light most favorable to the nonmoving party, Napier, and draw all reasonable inferences in his favor. *Id.* Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Napier has two closely related claims, both of which rest on the proposition that Orchard's explanation for rejecting an employment relationship with him was dishonest. We take each in turn, holding that neither claim survives summary judgment.

### A.  Napier's Discrimination Claim Fails.

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). As relevant here, Title VII's prohibition on discrimination because of sex "protects men as well as women." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

#### 1.  *Ortiz* and *McDonnell Douglas* Align.

To assess Napier's claim, we look at the direct and indirect evidence together as a whole and determine whether it would

permit a reasonable factfinder to conclude that his sex caused his termination. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016). In light of *Ortiz*, Napier argues that the district court erred by adhering to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] He is wrong for two reasons.

First, "*McDonnell Douglas* is entirely consistent with our holding in *Ortiz*, and it 'remains an efficient way to organize, present, and assess evidence in discrimination cases.'" *Reives*, 29 F.4th at 892 (internal citation omitted) (quoting *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). "As long as the court considers the evidence as a whole, it may also use the *McDonnell Douglas* framework as a supplemental tool." *Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020). We do caution that *McDonnell Douglas* may have limited value as a heuristic when a plaintiff has not taken that approach to presenting his case. *See, e.g., Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040–41 (7th Cir. 2023) (advising that *Ortiz* and *McDonnell Douglas* are both ways in which a plaintiff may have "gathered the evidence, organized it, and explained how

---

[3] Under *McDonnell Douglas*, a Title VII plaintiff generally must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably. *Reives*, 29 F.4th at 891. Once a plaintiff meets that burden, "the burden shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)).

and why a trier of fact could conclude that it added up to ... discrimination.").

Second, Napier's argument is perplexing because after determining that Napier's claim failed a *McDonnell Douglas* analysis, the district court went on to conclude that the claim failed under an *Ortiz* assessment of the evidence, too. *See Reives*, 29 F.4th at 892 ("Regardless of the approach we use, however, Reives's discrimination claim cannot survive summary judgment."); *see also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) ("Igasaki failed to assert a prima facie case for race and sex discrimination under the *McDonnell Douglas* framework. Igasaki's case also falls short under *Ortiz*.").

In short, "[a]lthough there are many tests and rubrics for viewing discrimination claims ... they are all merely convenient ways to organize our thoughts" as we decide whether a reasonable factfinder could conclude that a plaintiff's protected characteristic caused an adverse employment action. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citing *Ortiz*, 834 F.3d at 765).

Here, because Orchard argues it terminated Napier based on his performance, the *McDonnell Douglas* and *Ortiz* frameworks come together. "We may skip the *McDonnell Douglas* prima facie analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (citing *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265,

271 (7th Cir. 2023)). "[I]ssues of satisfactory performance and pretext overlap," so we proceed directly to pretext.[4] *Id.*

### 2. The Record Lacks Evidence That Helvie's Reason For Terminating Napier Was Pretextual.

Pretext is "[a] lie, specifically a phony reason for some action," not "just faulty reasoning or mistaken judgment on the part of the employer...." *Barnes v. Board of Trustees of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). At the same time, "[p]retext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000). Said differently, when there is sufficient evidence that an employment action was discriminatory, an employer cannot sanitize the decision by pointing to a legitimate problem with an employee's performance.

Orchard's performance-based justification for terminating Napier is straightforward: Napier breached Helvie's trust.

---

[4] Currently, when we evaluate a male plaintiff's "reverse discrimination" claim under the *McDonnell Douglas* framework, the plaintiff must first establish "background circumstances" that demonstrate that a particular employer has reason or inclination to discriminate invidiously against men or evidence that "there is something 'fishy' about the facts at hand." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quoting *Phelan v. City of Chicago*, 347 F.3d 679, 684–85 (7th Cir. 2003)). The Supreme Court will soon decide whether this "background circumstances" requirement is consistent with the text of Title VII. *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 118 (2024). That pending decision does not bear upon on the analysis in this case. We bypass the initial stages of *McDonnell Douglas*, and our pretext inquiry does not hold Napier to a greater burden because he is a man.

True, Napier's relationship with Helvie was just one facet of his job, and Orchard does not contend that Napier was otherwise deficient in the role. But given Orchard's leadership structure, Helvie's confidence in Napier was central to his performance.

Relatedly, the evidence shows that Helvie alone made the decision to terminate Napier, with little to no input from members of the Board, Eble, or anyone else.[5] That means events predating Helvie's time with Orchard—such as discontent about the dynamics of the then-all-male leadership—are a red herring.

With that observation, this appeal boils down to whether there is sufficient evidence for a reasonable factfinder to decide that Helvie's justification for terminating Napier was pretext for sex discrimination. Despite Napier's arguments to the contrary, that evidence is absent.

We see no indication that Helvie's reason for terminating Napier was dishonest. Napier disputes that Helvie specifically instructed him not to tell Brothers about the review of her job description, so on this posture, we accept that Helvie did not. Still, Napier conceded that even if Helvie never expressly told him to keep that project a secret, Helvie often ended leadership meetings with a reminder to keep things confidential. At the least, Napier should have known that it was a sensitive topic. Telling Brothers that she might be on the chopping block—before Helvie had made a decision—

---

[5] Helvie may have emailed the co-chairs of the Board with her concerns regarding Napier, but the record lacks information about their response, or for that matter, any evidence suggesting they had exerted influence over the decision.

predictably introduced turmoil into the workplace. Plus, Napier had already created friction with Helvie on a previous occasion by authorizing a job posting.[6] It is easy to see why Helvie would have felt that Napier was undermining her leadership, and further, why she would have found that to be an intolerable dynamic between the Head of School and the Middle School Director.

To put it colloquially, Helvie's story checks out. She raised concerns about Napier's breach of confidentiality to the Board's co-chairs immediately after it happened. She gave that same reason to Napier himself when she terminated him. Nowhere in the record does Helvie waver on why she did not renew Napier's contract. She could not trust him.

Even if we were to assume Helvie used Napier's disclosures as a convenient excuse for something she wanted to do regardless, Napier's claim is not necessarily on stronger footing. "[A] showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

None of Napier's attempts at demonstrating that Helvie held his sex against him are persuasive. Take, for instance, Helvie replacing Napier and Schwartz on the Senior Administrative Team with two women (Bostrom and Williams) who indeed held prominent administrative roles. It is hard to see a nefarious motive behind this reorganization, which provided Napier and Schwartz with less insight into Orchard's

---

[6] Napier disputes that Helvie adequately communicated that he should not post the opening, but he admits that she was unhappy and had the posting taken down.

direction but did not alter their pay or day-to-day work. After all, Napier and Schwartz remained on the Academic Leadership Team, which handled the issues affecting Orchard's two constituent schools.

Other supposed slights, such as Helvie denying Napier's request that Orchard not send out an email announcing his departure, or Helvie refusing to inform faculty and parents specifically why Napier was leaving the school, also bear no apparent relation to Napier's sex. And, although Napier highlights that Helvie made him report to Eble, and declined to meet with Napier individually, Napier admitted in his deposition that he was not certain that Helvie did so because he was a man. Napier speculated that gender may have played an indirect role, because Helvie only wanted to meet with people who she was comfortable with, and she was more comfortable with "non-threatening" and "subservient" men, labels that apparently did not fit him.

Napier's main proof for why Eble fell into those categories, but he did not, is that Eble declined to speak up when Helvie brought him a birthday cake containing nuts, in violation of Eble's efforts to protect Orchard students with nut allergies. Napier also observed that he is much taller than Helvie, which parents would sometimes awkwardly bring up during meetings. Neither Eble's timidity nor Helvie's annoyance at comments about height are sufficient to demonstrate that she was inclined to discriminate against Napier because he is a man.

At core, Napier's theory is that Helvie targeted him because he was one man too many at Orchard, but we lack evidence Helvie held that view of Orchard's leadership. Yes, Eble and others may have complained about Orchard having a

surplus of men in charge, but Napier did not recall those statements persisting after Helvie started. Certainly, and crucially, there is no record of Helvie making similar remarks. With no evidence that Helvie was even aware of what others had said about Orchard's ratio of men to women, Napier's contention that Helvie agreed with those comments is entirely speculative.

Finally, Napier's brief invites us to infer that Helvie was biased against men because of her educational background in women's studies.[7] We decline to make such a leap based on nothing in this record other than Helvie's choice of study and the degrees she received fifteen to twenty-five years prior to the events in this case.

### 3. Napier's Other Purported Evidence Of Pretext, Including Comparator Evidence, Does Not Save His Claim.

Another way that Napier tries to show pretext is by identifying five similarly-situated female employees that Orchard allegedly treated better than him: Bostrom, Williams, Brothers, Bricker, and even Helvie herself. We consider this evidence not to evaluate whether Napier made a *prima facie* case under *McDonnell Douglas*, but rather because "comparator evidence and selective enforcement of an employer's rules" are relevant to a pretext analysis. *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018); *see also Coleman v. Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012) ("[T]he similarly-situated inquiry and the pretext inquiry are not hermetically sealed off from one another."). When using comparators to demonstrate

---

[7] We attribute this argument to an advocacy choice by Napier's counsel.

pretext, a plaintiff must usually "show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman*, 667 F.3d at 846 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). "Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Id.* (cleaned up).

All the purported comparators fail that test. Bostrom and Williams are virtually absent from the events in this case; at most, they were women placed on the Senior Administrative Team instead of Napier. Brothers, unlike Napier, did not violate Helvie's confidentiality expectations. Bricker somewhat resembles Napier in that she angered Helvie by disclosing her demotion on Facebook, but she held a lower-ranked position than Napier even before she was demoted to classroom teacher, making it difficult to compare Napier's termination with Bricker retaining the option to stay on after her Facebook post. Lastly, Helvie was Napier's supervisor and the one who terminated him, so she cannot be "similarly situated" to Napier. *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir. 2008).

There is a bit more to say about Brothers. Napier contends that it is possible to infer sex discrimination because Brothers was unqualified to replace him as Director of the Middle School. Not so. Helvie offered Brothers the job as Acting Director on the same afternoon, but she terminated Napier because she no longer trusted him, not because she wanted to put Brothers in the role. With Napier gone, promoting Brothers was a way for Helvie to reduce the fallout from

eliminating Brothers's counselor position. Brothers had over two decades of experience with Orchard, and while Napier now argues she was unfit for the position, at the time he encouraged Brothers to take the job to prevent Orchard from becoming unglued. Thus, Helvie's apparent "two birds with one stone" approach to hiring Brothers does not help Napier's claim.

That is also how we view the events following Napier's termination. Orchard never sent a written statement explaining the decision, but Helvie's verbal explanations were clear and consistent. Additionally, while the Board deferred to Helvie's judgment as Head of School and did not independently investigate or reconsider Napier's termination, "merely pointing to an employer's shoddy investigatory efforts" is insufficient "to establish pretext." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). To be sure, an investigation "may have some bearing on the truthfulness of [an employer's] proffered reasons for terminating [an employee]," *id.*, but here our doubt is not great enough for Orchard's deficiencies to move the needle.[8]

Ultimately, the evidence shows that Helvie terminated Napier, who was popular in the Orchard community, because

---

[8] We note that Napier's initial letter to the acting chair of the Board on March 15, 2019 was silent on sex discrimination, and he seemingly did not raise the subject until a follow-up communication in June 2019. A Title VII plaintiff need not immediately cry discrimination in response to an adverse employment action, but in this factual pattern, the absence of an investigation would be more troubling if Napier had promptly accused Orchard of terminating him based on sex. Similarly, while it would raise eyebrows if Orchard failed to abide by its policy requiring an investigation, Napier does not point to any such policy.

he breached her trust. "Whether this was wise is, again, not a question of pretext, which looks only to veracity." *Barnes*, 946 F.3d at 390. We are strictly in the business of reviewing whether there is evidence that Orchard's employment decision was discriminatory. *See Joll v. Valparaiso Community Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) ("We have said time and again (in more than one hundred reported opinions, by our count) that we are not a super-personnel department that will substitute our criteria for an employer's for hiring, promoting, or disciplining employees."). At the end of that review, our conclusion is that no reasonable factfinder could find that Napier lost his job based on his sex.

## B. Napier's Retaliation Claim Also Fails.

To survive summary judgment on his retaliation claim, Napier must show that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there was a but-for causal link between the protected activity and the adverse action. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021); *Gracia v. SigmaTron International, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (citing *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013)). Orchard agrees that Napier's complaint was protected activity and that the decision not to rehire him was an adverse action, so we look at the third element only.

Orchard says it rejected Napier based on his "past poor performance," but Napier argues that cannot be true because Eble made the rejection decision, and Eble did not specifically know why Napier was terminated. Although it is true that Eble did not know exactly why Helvie terminated Napier, he was aware that they had a fractured relationship, and he accurately inferred that Napier breached Helvie's trust. The

record evidence indicates that Eble sincerely believed that Orchard terminated Napier for cause and would have had little reason to rehire him less than a year later. No reasonable factfinder could determine that Napier's litigation, rather than the events that led to his termination, was the "but-for" cause of Orchard's decision not to rehire him.

### III. Conclusion

We AFFIRM the district court judgment.